IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MONICA MCCARRICK,

               Petitioner,

        vs.

MICHAEL PALLARES, Acting Warden, Central California Women's Facility,[1]

               Respondent.

No. 2:17-cv-02652-JKS

MEMORANDUM DECISION

Monica McCarrick, a state prisoner now represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. McCarrick is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Central California Women's Facility. Respondent has answered, and McCarrick has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On March 28, 2011, McCarrick was charged with the malice aforethought murder of her three-year old daughters, L.B. and T.B. The information also charged McCarrick with two counts of assault on a child causing death. McCarrick entered a not-guilty plea and subsequently added a plea of not guilty by reason of insanity. On direct appeal of her conviction, the California Court of Appeals recounted the following facts underlying the charges against McCarrick and the evidence presented at trial during the guilt phase and the sanity phase:

---

[1]      Michael Pallares is substituted for Janelle Espinoza as Acting Warden, Central California Women's Facility. FED. R. CIV. P. 25(d).

### A. Guilt Phase

#### 1. The Crimes and Crime Scene

On the evening of October 12, 2010, [McCarrick] killed her three-year-old twin daughters, Lily and Tori Ball, with a sword.  A downstairs neighbor heard loud thumping from [McCarrick's] apartment.  An hour or two later, a fire alarm went off, and the neighbor saw smoke coming from one of the windows.  He ran upstairs and kicked in the front door, but it was blocked, and he was unable to enter.  He succeeded in breaking a sliding glass door; when he entered the apartment, he saw a sword on the floor, covered in blood.

Firefighters arrived and found the door to the apartment slightly ajar but difficult to open.  They forced the door open, found a fire in a closet near the front door, and extinguished it.  They then found the bodies of Lily and Tori close to the door.  One of the bodies had been blocking the door.  The girls had both suffered severe lacerations, and were dead.  The firefighters found [McCarrick] in the kitchen and carried her out.  She was unconscious and had sustained injuries, including cuts to her throat and wrist.

A search of the apartment revealed an assault rifle and a shotgun in the living room and a box with a loaded handgun and additional live rounds.  In the hallway was a straight-bladed sword covered with blood.  Near it was a lighter with blood on it.  Two high chairs had been overturned in the dining room, with their food trays removed.  The high chairs were completely soaked in blood.  On a table facing the highchairs was a laptop computer playing an animated children's program.  In the kitchen, a landline telephone was on the counter; both the telephone and the countertop were covered in blood.  Water was running from the bathroom faucet, and blood was in the sink and on the counter.  A cell phone was on the bathroom floor, and on a stool was a novel by James Patterson, Double Cross (2007).  The book was about a serial killer, and it was open to a page that contained the words, "My daughter is dead."

#### 2. The Injuries

The doctor who performed the autopsies on the two girls testified about their injuries.  Tori had 11 cutting wounds to her face, two cutting wounds to her neck, a gaping wound on the front of her neck, nine superficial cutting wounds to her chest, two deep stab wounds on her chest, one of which penetrated her heart and the other her lung, a deep stab wound to her abdomen as well as three small superficial cutting wounds to the abdomen, and wounds on her hands and arms consistent with defensive wounds.  Lily had five cutting wounds to her face, four to her neck, and nine to her chest; a large gaping wound to the front of her neck that had severed her larynx and cut the carotid arteries; multiple defensive wounds to her hands and arms; and a six-inch-deep stab wound to her abdomen.  Neither girl had inhaled smoke, which meant they were dead before the fire started.

[McCarrick] had multiple injuries and was in critical condition.  She had two large lacerations to her throat and multiple cuts and lacerations on her arms and wrists.  On one of her arms the tendons that flex the wrist and fingers were severed.  She had a

large laceration on her upper thigh and large lacerations on each ankle, which cut the Achilles tendons.  Tests for alcohol, cocaine, and methamphetamine were negative.

### 3. Observations of [McCarrick's] Fiancé

[McCarrick] and her two daughters lived with [McCarrick's] fiancé, Robert Paulson.  [McCarrick] and Paulson had known each other about a decade previously and renewed their relationship over Facebook around Thanksgiving of 2009.  They became engaged in May 2010, and [McCarrick] and her daughters moved to California from Pennsylvania during the last week of August 2010.  Paulson's job required large amounts of travel, and on September 9, shortly after the couple moved into their new apartment, he was called away for a month-long assignment in Minnesota.  On October 11, Paulson was told he would have to go to Alaska for five to 10 days after the Minnesota assignment ended, rather than returning home.  [McCarrick] was upset when Paulson told her about the extension of his trip.

Paulson and [McCarrick] spoke on the telephone several times on October 12, the day of the killings.  One of the calls took place during the evening, on [McCarrick's] cell phone.  [McCarrick] was incoherent and "jumbled," and sounded like she was running around the house doing something.  Paulson heard [McCarrick] "freaking out," and "hysterical noises going on in the background."  She told him, "If Tori and Lily are okay tell them that it was an accident."  He heard her say, "It's okay.  It's going to be okay. We are going to make a fire.  We are going to make a fire"; then he heard a fire alarm go off, and then a scream, and then the call ended.  He tried to call the apartment several times but got no response.

### 4. [McCarrick's] Recent Behavior

On the morning of the day of the killings, the assistant manager of the apartment complex where [McCarrick] lived asked [McCarrick] to move her car because it was blocking other parking spots.  At first, [McCarrick] would not open her apartment door. [McCarrick] had a hard time telling the assistant manager what she wanted her to do and why the car was parked the way it was.  The assistant manager watched the girls while [McCarrick] moved the car.

On the morning of the same day, the assistant manager had noticed [McCarrick] had a work order to have her locks changed.  [McCarrick] later called to ask whether the maintenance department had changed the locks.  The girls were crying in the background, and [McCarrick] seemed to want the assistant manager to help her with the girls.

Terry Fay, the paternal grandmother of Lily and Tori, lived in southern California.  She spoke with [McCarrick] often by telephone, and she had cared for the girls on occasion.  On October 11, 2010, [McCarrick] called Fay and asked, "Who is going to take the girls?"  Fay thought [McCarrick] needed someone to take care of the girls.  Fay told [McCarrick] that if she brought the girls to her home, Fay and her family would begin proceedings to have custody of them.  [McCarrick] did not sound rational during the conversation.  She told Fay that Paulson had had a vendetta against her for 10 years and was kicking her out.

### 5. *Defense Evidence*

#### a. [McCarrick's] Fiancé

Robert Paulson was called as a defense witness.  He testified that he had previously had a relationship with a woman named Jill who killed herself with one of Paulson's guns in April 2010, several months after their relationship ended.

While [McCarrick] was living in Pennsylvania, she appeared happy and stable.  She was working at a dental office and going to school.  She was supportive as Paulson coped with Jill's death.  When [McCarrick] moved to California, she looked for a school so she could get a license to be a dental assistant in the state.  Paulson provided money when [McCarrick] needed it.  Paulson thought [McCarrick] was a good mother, and she never did anything to make him think she would harm her daughters.

Paulson noticed that [McCarrick] changed two or three weeks after he left on his business trip, and in the two and a half weeks before the killings they had a series of communications that led Paulson to believe her behavior was "slowly deteriorating."  She found a synopsis for a horror movie Paulson was writing with a friend, which he described as a "slasher" film about a man stalking children on a beach, in which "everyone died."  [McCarrick] was upset and thought Paulson had written the story about her and that he might hurt her.  She repeatedly brought the subject up during their conversations during Paulson's absence and suggested he had resumed their relationship in order to hurt her.  [McCarrick] also questioned Paulson about whether he had driven Jill to suicide, accused him of being with another woman, and said his female friends hated her.  She expressed her fear of a UPS delivery man and said he had entered the apartment.  At times she said she would not leave the apartment because someone was sitting in a car outside.  She thought a Facebook post by a friend of Paulson's, which made a joke about breaking up with a girlfriend using "Dobermans, tasers, and rounds," referred to her.  Her mood went "up and down"; Paulson would spend hours reassuring her, she would seem fine, and the next day she would be upset again.  She also indicated she wanted help with the children.

When Paulson told [McCarrick] he had to go to Alaska for a few days after the Minnesota job, she was upset and they argued.  She wanted him to come home and said she missed him.  On the evening of the killings, [McCarrick] sent him text messages that caused him concern.  One, which he said "made no sense," referred to "robot butterflies" and concluded "u will never have me again!"  In another, [McCarrick] told Paulson to say to the children's father, " 'let the bunnies go forever so we can keep what's ours' and say that defending then [sic] is the number 1 most high on your priority list [etc.]."  This was apparently a reference to their hope that Lily and Tori's father might give up his parental rights so Paulson could adopt them.  Later in the evening, [McCarrick] sent a text message that said, "Tick tock."  Another message said, "Read James Patterson."  When they spoke on the telephone that evening, [McCarrick] "rant[ed]" and ran around.  She would hang up, and he would call her back.  Paulson described her conversation as "rambling.  No coherent thought or trying to get any message across of what was going on."  She did not respond to his attempts to communicate with her after the last call ended.

4

**b. Paulson's Mother**

Paulson's mother, Roxanne Paulson, testified that she had helped [McCarrick] and the girls move to California from Pennsylvania in August 2010.[FN2]  Roxanne continued to have frequent contact with them after they moved into their apartment in September.  Roxanne became concerned because [McCarrick] seemed nervous and anxious.  A few days before the killings, [McCarrick] and the girls spent the night at Roxanne's home.  Between 2:00 and 3:00 in the morning, [McCarrick] decided to leave. When she took one of the girls to the car, she told Roxanne there was a car outside; she thought someone was watching her.  Roxanne reassured her that the person was a neighbor who left for work early.  After the girls were in the car, [McCarrick] texted Roxanne to ask if it was safe to leave.  Once they got home, she texted Roxanne to tell her they were safe.  The day before the killings, [McCarrick] called Roxanne at work and told her the UPS driver was coming into the apartment.  Roxanne testified that [McCarrick] was having a hard time managing while Paulson was out of town.

> FN2.   To avoid confusion, we shall refer to Paulson's mother as Roxanne.  We intend no disrespect.

**c. [McCarrick's] Mother**

[McCarrick's] mother testified that [McCarrick] was managing well before moving from Pennsylvania to California.  [McCarrick] began expressing fear of Paulson shortly after she moved.  When [McCarrick] visited her mother in San Diego from September 29 to October 4, 2010, she brought the synopsis of the horror movie Paulson had worked on and asked her mother what she thought of it and whether it meant Paulson was feeling violent toward her.  During the visit, she repeatedly discussed her fears and her uncertainty about getting married.   She expressed her concern about the fact that Paulson kept guns in the apartment, but she did not mention the sword.  She appeared anxious and disorganized.  [McCarrick] and her mother shopped for a wedding dress; when they did so, [McCarrick] did not seem fearful.

On October 11, the day before the killings, [McCarrick] called her mother, who told her it was not a good time to talk.  She asked if [McCarrick] had called about something important, and [McCarrick] said, "No, it's okay."  She sounded sad and subdued.

**d. [McCarrick's] Friends**

Three friends of [McCarrick] also testified to her state of mind before the killings. Regina B. testified that [McCarrick] sent her a text message on September 25, 2010, saying she was afraid that Paulson and his mother were out to get her, and that Regina B. should let someone know if anything happened to [McCarrick] or if she went missing.

Maritza D., a friend from Pennsylvania, testified that she was in regular contact with [McCarrick] after the move to California.  Within about a week of the move, [McCarrick] began to express concern about whether Paulson and his mother would accept her.  On September 25, [McCarrick] sent Maritza D. text messages saying, "My fiancé Robert Paulson and his mom are acting strange, so f.y.I. [sic] if I end up missing or

5

turn up dead or they try to say I committed suicide it is a [] coverup so feel free to get revenge for me." Maritza D. called [McCarrick], who told her that she was afraid Paulson was not going to approve of her and the children, that she was jealous of his relationships over Facebook, and that they were not getting along. She also said she was afraid because of a book Paulson was writing about a murder of a wife or girlfriend. On September 29, [McCarrick] sent Maritza D. texts saying, "They want to steal the girls [] And kill me I think[.]" They had further conversations that were "all about the fear"; the last one was about a week before the killings.

Pamela T., [McCarrick's] friend who lived in Los Angeles, testified that [McCarrick] told her she was afraid Paulson would hurt her or kill her. In a text dated September 25,[FN3] [McCarrick] said "He scares me. I feel like he is going to hurt me. I never meant to hurt him . . . . I need to know I am safe so hopefully this is a paranoid delusion but I'm telling u if I end up missing or turn up dead and or they say I tried to commit suicide it is a coverup." Pamela T. recommended that [McCarrick] visit her mother. Later, [McCarrick] sent Pamela T. a picture of herself in a wedding dress. In the week or two before the killings, [McCarrick] told Pamela T. she was afraid and had arranged a telephone counseling appointment for October 6 to help her deal with the situation. During a conversation within two weeks of the killings, [McCarrick] said she had read an obituary of Paulson's former girlfriend and that she thought that rather than dying by suicide, Jill had been killed by Paulson.

> FN3:   Pamela T. testified the date on the text was October 3; however, the copy of the text message in the record indicates it was sent on September 25.

**B. Sanity Phase**

The parties stipulated that the jury could consider in the sanity phase all evidence that had been presented in the guilt phase. In addition, three mental health professionals who had evaluated [McCarrick] testified on her behalf at the sanity phase of the trial. [McCarrick's] theory was that she suffered from delusions that she, Lily, and Tori were going to be kidnapped and held in slavery, and that the only way to save the girls from this fate was to kill them.

### *1. John Shields, Ph.D.*

Dr. Shields testified that he had met with [McCarrick] nine times between October 2010 and June 2011 and had spent more than 20 hours with her. He administered psychological tests, interviewed [McCarrick's] mother, and reviewed other documents, including reports of other interviews, police reports, and mental health records. He opined that [McCarrick] suffered from a mental disease, most probably a depressive condition, which had first manifested itself when she was 12 years old when she was hospitalized in 1995 for suicidal ideation and superficial self-inflicted wounds. The records from that incident indicated she had tried to harm herself in the past. At age 14, [McCarrick] was diagnosed with a form of attention deficit disorder and received medication. Dr. Shields testified that adolescents with untreated depressive disorders

6

often develop substance abuse problems.  Dr. Shields also opined that [McCarrick] had bipolar disorder with psychotic features, signs of a delusional disorder, and polysubstance abuse.

[McCarrick] was diagnosed with major depression sometime between 2003 and 2005 while she was living in San Diego and received psychiatric treatment.  During that time, she reported experiencing paranoid thoughts.

[McCarrick] reported that she started using alcohol at age 12 and began using illegal drugs, including marijuana, LSD, mushrooms, methamphetamine, Ecstasy, and possibly cocaine, by age 14.  She continued using Ecstasy until age 27.[FN4]  She began using crystal methamphetamine at age 18.  She continued to use it regularly, except while she was pregnant with the twins.  She reported variations in her pattern of methamphetamine use and said she used it less as time went on; at another point, however, she said she used it nearly every day until she was 25 years old.  She was using it during the month of September 2010, the month she sent some of the text messages.  A text message from the time she was visiting her mother in late September and early October 2010 indicated she was using methamphetamine.  She told Dr. Shields she smoked it in Roxanne's garage four days before the killings.[FN5]  In an October 10, 2010 text message to Paulson, [McCarrick] wrote, "You wanted me to stay thin and said it was important and okayed me to use to do that."

FN4.  [McCarrick] was 28 years old at the time of the killings.

FN5.  [McCarrick] told Dr. Shields this was the last time she used methamphetamine before the killings.

Dr. Shields testified that paranoia is a common side effect of ongoing methamphetamine use.  Long-term drug use can cause mental problems well after someone uses the drug, and it can cause delusions.

Psychological testing administered by Dr. Shields showed that [McCarrick] did not have a significant probability of faked mental illness or impairment; suggested that she was experiencing suicidal ideation; showed that her intellectual functioning was well above average; showed that she had impaired executive functioning; and suggested that she had severe mental illness.

Dr. Shields believed that [McCarrick's] mental disorder played a role in her actions the night of the killings and that her actions were "largely a product of that mental illness in combination with the defective reasoning."  In his view, drugs were not the primary cause of [McCarrick's] actions, although he acknowledged that there was a possibility that her long-term daily drug use could have caused her to have the issues she had on the day of the killings.  In his opinion, [McCarrick's] actions were largely motivated by the delusional idea that she was being persecuted and that someone was going to take her daughters, separate them, enslave them in a camp setting, and torture them eternally.  This delusion was fueled by the story Paulson had written about girls or women being taken to an island, mistreated, and killed.  She believed that the UPS driver had keys to her apartment and was part of the conspiracy to harm her and the girls and

7

that messages were embedded in videos or shows she and the children were watching after the move to California.  She told Dr. Shields that while she was reading the novel Double Cross, she understood a reference to the time of day in the book to refer to the time that people were going to come and take her daughters away into slavery.  Dr. Shields characterized this belief as an "idea of reference," which was a psychotic symptom.

A few days before the killings, [McCarrick] and the girls were eating pizza at Roxanne's house.  [McCarrick] told Dr. Shields the pizza made them sick, and she believed it was poisoned as part of an effort by someone, including Roxanne, to kill her and her daughters.[FN6]  When Paulson told her he was going to Alaska instead of returning to California immediately, [McCarrick] believed that was a sign she or one of the girls was going to be taken to an enslavement camp in Alaska.  She became increasingly desperate to prevent that from happening.  She believed the only way she could save the children from enslavement was to kill them and herself.  On the day of the killings, she sent Paulson a text that read, "Your [sic] separating them?"  [McCarrick] told Dr. Shields she started the fire because she wanted to hide the evidence of what she had done so her family would not find out.

> FN6.   The pizza incident occurred around the time [McCarrick] smoked methamphetamine in Roxanne's garage.

Dr. Shields concluded that [McCarrick's] delusion, or false belief that she and the girls were going to be enslaved, and her "ideas of reference" or belief that real events (such as Paulson's trip to Alaska) had another meaning, were symptoms of psychosis and that [McCarrick's] false belief was a product of her mental illness.  In light of [McCarrick's] history of methamphetamine use, he had considered whether her beliefs were the product of intoxication.  He stated that there was "no question that [McCarrick] had paranoid ideas related to meth use at times," but that there was also "some indication that she had paranoid or delusional ideas that were likely not related to intoxication with methamphetamine."  He based this conclusion on [McCarrick's] statements to him, the toxicology report the day after the killings, and information related to [McCarrick's] subsequent treatment in the county jail.

Dr. Shields testified that [McCarrick's] mental disorder affected her ability to understand the nature and quality of her actions.  She was not able to appreciate her acts' harmful nature because she believed she was saving the children from harm, not causing them harm.  Dr. Shields opined that at the time of the killing, [McCarrick] was unable to recognize the moral or legal wrongfulness of her actions.

[McCarrick's] county jail records indicated that by nine days after the killings, she said she was not suicidal.  She told the jail psychiatric staff she never heard voices, although she later said otherwise.  A jail psychiatrist who saw [McCarrick] for a year and a half diagnosed her with chronic and recurring adjustment disorder issues.  She also received diagnoses of bipolar disorder with psychosis and depressive disorder with psychosis, and the psychiatrist also considered a diagnosis of a disorder on the schizophrenic spectrum.  [McCarrick] was given antipsychotic and antidepressive

medication in jail.  On October 25, 2011, [McCarrick] told another inmate to "cut themselves and hear voices and shit" so they could meet each other at the hospital.  In November 2011, [McCarrick] reported paranoid thoughts that people were going to attack her.  In April 2012, she used cocaine and drank 12 cups of coffee and was treated for a possible overdose.  She was described as paranoid, delusional, and psychotic.  She stated that gangs were out to kill her for "snitch[ing]" on a boyfriend 10 years previously, and that if she had the means, she would slit her throat and hang herself.  She said she "gets drugs from the guards."

Some of [McCarrick's] text messages from the period before the killings discuss the stress she experienced because she had to care for the children on her own.  In one, she said she wanted to be young and free and be able to "party."  Facebook messages [McCarrick] exchanged on October 3 and October 7 revealed no delusions, paranoia, or fear of Paulson.

### 2. Pablo Stewart, M.D.

Dr. Pablo Stewart, a psychiatrist, also evaluated [McCarrick].  He opined that on the day of the killings, she was suffering from major depressive disorder with psychotic features.  He also opined that this was the most recent episode of a recurrent major depressive disorder that preexisted her substance abuse.

Dr. Stewart had reviewed voluminous documents and treatment records and interviewed [McCarrick] three times.  He noted that [McCarrick] was involuntarily hospitalized at age 12 after cutting her wrists.  She had been drinking alcohol at the time she was taken to the hospital and had a .10 percent blood alcohol level.  She began abusing multiple substances after that.  There was no indication in [McCarrick's] records that she received follow-up care after her hospitalization, and Dr. Stewart noted that it was common for psychiatric patients who do not receive proper mental health care to self-medicate through substance abuse.  [McCarrick's] methamphetamine use from age 18 to 25 was "significant."

When [McCarrick] was a young adult living in San Diego between 2003 and 2005, she was diagnosed with major depressive disorder and began treatment with antidepressants.  The records indicated that during a three-month period when [McCarrick] reported she was not using methamphetamine, she began to have paranoid delusions.  There were times that she reported she was using methamphetamine but did not have psychotic symptoms.  [McCarrick] reported that she did not use methamphetamine during her pregnancy with the twins and that she used it only occasionally in the ensuing period while she lived in Pennsylvania with an aunt.  She did not report any psychotic symptoms during the time she was pregnant.

When [McCarrick] returned to California in August 2010 to live with Paulson, she was under a lot of stress and was ripe for a recurrence of major depression.  She was having difficulty caring for the children and had less support than had been available in Pennsylvania.  She was having sleep disturbances, was irritable, and said things people found difficult to understand.  Dr. Stewart believed [McCarrick] was suffering from major depression in September and October of 2010.

9

Dr. Stewart opined that at the time of the killings, [McCarrick] was in a state of psychosis, suffering from paranoid delusions.  He noted that while [McCarrick] was treated for her injuries at the hospital after the killings, a doctor thought she was suffering from a major depressive episode or a psychotic episode.  Four days after [McCarrick] was transferred from the hospital to the jail, she was put on antipsychotic medication, which suggested that the psychiatrists at the jail believed she was experiencing a psychotic disorder.  In jail, [McCarrick] was diagnosed at various points with bipolar disorder, schizophrenia, schizoaffective disorder, and adjustment disorder.  [McCarrick] was on antipsychotic medication during her entire time in custody.

Dr. Stewart testified he believed [McCarrick's] substance abuse history played a role in the crimes.  She had reported using methamphetamine about once a week in the period before the homicide, which Dr. Stewart said contributed to her mental state.  However, he believed her chronic depressive condition, which was exacerbated when she returned to California, was the primary reason for her altered mental state.  He also testified that it takes two and a half days for methamphetamine to be eliminated from a person's system but that it can take longer in the case of someone who has used it for a prolonged period.  In light of [McCarrick's] negative test after the killings, Dr. Stewart did not think the use of drugs had an appreciable impact on her mental state at the time of the killings.  He thought it was very unlikely that [McCarrick's] delusions were the result of methamphetamine withdrawal.  Dr. Stewart was also aware that [McCarrick's] mother had tested her for drugs on her recent visit to San Diego and that the test was negative.

Dr. Stewart opined that [McCarrick] understood the nature and quality of her acts at the time of the killings, that is, she knew she had a sword and was going to kill her children.  However, in his opinion, [McCarrick] was not capable of understanding that her actions were morally or legally wrong.  He explained that [McCarrick] was operating under profound psychotic delusions which caused her to believe killing the children was the best thing she could do to protect them.  He believed that drugs contributed to her delusions, but not to an appreciable degree, that the major factor affecting her thinking was her depression, and that in the absence of the depression she would not have killed her children.

Dr. Stewart acknowledged that the messages indicating [McCarrick] feared Paulson was part of a plot to harm her were sent in September and that [McCarrick] did not express that concern in any later messages.  However, [McCarrick] had told Dr. Stewart that at the time of the killings she was afraid people were going to break into her apartment, kidnap her and her children, enslave them, and rape the children.  He did not think the fact that [McCarrick] used the children's bodies to block the door indicated she understood her actions were wrong, because her psychotic plan was to burn the apartment down so there would be nothing for anyone to see.

### 3. Janice Nakagawa, Ph.D.

Dr. Janice Nakagawa, a psychologist, also evaluated [McCarrick].  As well as reviewing documents, she interviewed [McCarrick] three times.  She concluded that [McCarrick] met the criteria for being not guilty by reason of insanity.

10

[McCarrick] described to Dr. Nakagawa her belief that she and her children would be kidnapped and raped or made sex slaves. She thought the movie synopsis indicated Paulson planned to kidnap her, she was concerned that times mentioned in the novel Double Cross indicated when the door would be kicked in, she believed people were going to come and get her, and she heard helicopters outside and thought they were coming for her. On October 10, she began thinking of killing the girls. When she went to the assistant manager's office on the day of the killings and found it closed, she thought that meant the people who planned to kidnap her were setting up their operations there. [McCarrick] mentioned that she had asked the assistant manager to watch the girls while she moved the car, but said she was not afraid because the assistant manager was a pregnant woman and the people who were going to harm them were predominantly men. However, she was afraid to leave the house because she had heard noises in the ceiling, and she thought "they were coming to get her."

[McCarrick] discussed the facts of the crime with Dr. Nakagawa. She described a telephone conversation she had with Paulson during the incident, saying "I get on the phone with Robert and told him about Lily and Tori, and say it's just like you wanted, and put the phone down and I get a book." She said she set the fire because it would be easier for her family if the house burnt down, and that if her family knew what had happened they would become involved with the people who were "after" her and the children. Dr. Nakagawa had noted that the text messages [McCarrick] sent did not show delusional or paranoid content; [McCarrick] said she did not want Paulson to know of her suspicions because if he did, he would carry out the plan sooner.

[McCarrick] told Dr. Nakagawa she had bought approximately two grams of methamphetamine in September and that she continued to use it off and on until October. However, it appeared she was not under the influence of drugs the day of the killings.

Dr. Nakagawa opined that [McCarrick] was experiencing paranoia and a delusional belief, which led her to commit the offenses. She diagnosed [McCarrick] as either bipolar with psychotic features or having a psychotic disorder not otherwise specified. In Dr. Nakagawa's clinical judgment, [McCarrick] was not malingering. Dr. Nakagawa did not believe [McCarrick] understood the nature and quality of her acts because she was paranoid or delusional. She also believed [McCarrick] was not capable of understanding that her acts were legally or morally wrong. She testified that [McCarrick's] drug use could have been a factor contributing to the emergence of psychotic symptoms and that drug use could trigger predispositions to delusions, paranoia, or depression. However, [McCarrick's] mental disorder, bipolar disorder with psychotic features, was independent of her drug use.

On cross-examination, the prosecutor elicited testimony about facts that Dr. Nakagawa did not know or consider when she reached her conclusions. In the latter part of September 2010, [McCarrick] had exchanged text messages with Paulson. One stated, "I am dying to smoke. I am leaving them alone here. They probably won't wake up but I can't help it. It's too hard to bring them everywhere." In a September 15, 2010 text message, [McCarrick] said, "I need some free time or I'll snap." Dr. Nakagawa had not taken these messages into account in reaching her conclusions.

11

[McCarrick] told Dr. Nakagawa she smoked a "bowl" in Roxanne's garage and then had paranoid delusions about Roxanne poisoning the food and people being "out to get her," and that because of the delusions she packed up the girls in the middle of the night and drove them back to the apartment.  Dr. Nakagawa acknowledged that these delusions were induced by methamphetamine.  She believed the delusions continued for the next few days, with or without the drugs.

[McCarrick] told Dr. Nakagawa that in the days leading up to the killings, she armed herself with a gun or sword and sat by the door waiting for people to come. [McCarrick] said she packed up the teddy bears and other stuffed animals because they had cameras in their eyes.  One of the girls was wearing a teddy bear harness when she was killed; Dr. Nakagawa did not ask [McCarrick] if that was consistent with her story that she had gotten rid of the stuffed animals.

On the day of the killings, [McCarrick] had a series of telephone calls and e-mails with a cousin, who reported that [McCarrick] said, "I don't know what to do," and "You are going to hate me."  Paulson had said in a statement that [McCarrick] told him on the telephone on the evening of the killings, "I am so sorry.  It's okay.  We are just making a fire."  Dr. Nakagawa agreed that these communications, as well as [McCarrick's] direction to Paulson to tell the girls it was an "accident" if they survived, could be taken into consideration in deciding whether [McCarrick] knew what she did was wrong.

*People v. McCarrick*, 210 Cal. Rptr. 3d 838, 841-50 (Cal. Ct. App. 2016).

At the conclusion of the two-week guilt phase of trial, the jury found McCarrick guilty as charged of two counts of first degree murder with a multiple-murder special circumstance finding, and two counts of assault on a child causing death.  After a week-long jury trial on the question of sanity, the jury found that McCarrick was sane at the time she committed the crimes. The trial court sentenced McCarrick to two consecutive terms of life without the possibility of parole ("LWOP") for the two murders and stayed pursuant to California Penal Code § 654[2] the sentences for the remaining counts.

---

[2]  Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  CAL. PENAL CODE § 654.

Through counsel, McCarrick appealed her conviction, arguing that: 1) the trial court committed instructional error by precluding the jury from considering McCarrick's paranoid delusions in resolving whether she had acted with premeditation and deliberation; 2) there was no substantial evidence to support the jury's sanity verdict because the jury "could not reasonably reject" the opinions of three defense experts that McCarrick had been legally insane; and 3) the trial court's issuance of CALCRIM 3450, which instructs the jury as to whether a defendant is legally insane, was problematic as given for a variety of reasons.  In a divided opinion published on November 30, 2016, the Court of Appeal affirmed the judgment against McCarrick.  *McCarrick*, 210 Cal. Rptr. 3d at 858.  Justice Streeter concurred with the appellate court's determination as to two grounds for relief, but issued a dissenting opinion as to that court's disposition of McCarrick's first claim.  McCarrick filed a counseled petition for review in the California Supreme Court, raising all claims unsuccessfully raised to the Court of Appeal. In a divided opinion, the Supreme Court denied review without comment on March 15, 2017.

McCarrick timely filed a *pro se* Petition for a Writ of Habeas Corpus in this Court on January 31, 2018.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).  McCarrick's request for the appointment of counsel was subsequently granted, and counsel filed a supplemental brief in support of the *pro se* Petition.  Docket No. 31.  Briefing is now complete, and the case is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In her Petition before this Court, McCarrick argues, as she did on direct appeal, that: 1) the trial court committed instructional error by precluding the jury from considering McCarrick's paranoid delusions in resolving whether she had acted with premeditation and

deliberation; 2) there was no substantial evidence to support the jury's sanity verdict because the jury "could not reasonably reject" the opinions of three defense experts that McCarrick had been legally insane; and 3) the trial court's issuance of CALCRIM 3450, which instructs the jury as to whether a defendant is legally insane, was problematic as given for a variety of reasons.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

14

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Grounds 1, 3. <u>*Instructional Error*</u>

McCarrick first argues that the trial court made errors with respect to two of its instructions to the jury. Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the

Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding."  *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at 72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.  *Id.* at 72-73.  "Beyond the specific guarantees enumerated in

16

the Bill of Rights, the Due Process clause has limited operation." *Id*.   Where the defect is the

failure to give an instruction, the burden is even heavier because an omitted or incomplete

instruction is less likely to be prejudicial than an instruction that misstates the law.  *See*

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is whether the trial

court's refusal to give the requested instruction "so infected the entire trial that the resulting

conviction violates due process."  *See id.* at 156-57; *Estelle*, 502 U.S. at 72.  Moreover, even if

the trial court's failure to give the instruction violated due process, habeas relief would still not

be available unless the error had a "substantial and injurious effect or influence in determining

the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519

U.S. 2, 5 (1996).

     A.     <u>Instructions as to paranoid delusions</u>

McCarrick first argues that the trial court erred in its instruction pursuant to CALCRIM

No. 627, which refers to hallucinations.  The record reflects that the trial court instructed the jury

pursuant to the standard version of CALCRIM No. 627 as follows:

> A hallucination is a perception that is not based on objective reality.  In other
> words, a person has a hallucination when the person believes that he or she is seeing or
> hearing or otherwise perceiving something that is not actually present or happening.  [¶]
> You may consider evidence of hallucinations, if any, in deciding whether the defendant
> acted with deliberation and premeditation.

During the guilt phase of her trial, McCarrick relied on the theory that, due to her

delusional beliefs, she did not premeditate or deliberate and therefore could not be guilty of first-

degree murder.  According to McCarrick, in light of her defense, the court should have modified

the instruction above to specifically refer to delusions.  She argues that the evidence showed that

she suffered from delusions rather than hallucinations, and thus under the instruction as given,

the jury was precluded from considering the effects of her paranoid delusions when considering whether McCarrick acted with premeditation and deliberation.  McCarrick contends that the court's failure to do so deprived her of her Sixth and Fourteenth Amendment rights to have the jury consider the evidence presented by the defense and determine whether she was guilty of a lesser offense.

In considering this claim on direct appeal, the Court of Appeal rejected it on both procedural and substantive grounds.  *McCarrick*, 210 Cal. Rptr. 3d at 851.  First, the appellate court concluded that the claim was forfeited from appellate review because McCarrick did not ask the trial court to modify the instruction to specifically refer to delusions.  The Court of Appeal rejected McCarrick's contention that forfeiture should not apply because it would have been futile to ask the trial court to include delusions in the instruction because the court had already rejected her interpretation of the law when it ruled that the only evidence that would be deemed to bear on premeditation and deliberation would be that reflecting hallucinations.  The court also rejected the claim on the merits, determining that there was no reasonable possibility that the jury interpreted the instruction to preclude it from considering McCarrick's claimed delusions that she and her daughters were at risk of harm.

As an initial matter, Respondent argues that the Court of Appeal's rejection of McCarrick's claim on procedural grounds also renders the claim procedurally barred from federal habeas review here.  The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial.  *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083,

18

1092-93 (9th Cir. 2004).  Federal courts "will not review a question of federal law decided by a

state court if the decision of that court rests on a state law ground that is independent of the

federal question and adequate to support the judgment."  *Coleman v. Thompson*, 501 U.S. 722,

729 (1991).

McCarrick acknowledges that the state court's holding as to forfeiture is not reviewable

by this Court.  Docket No. 41 at 6.  McCarrick nonetheless argues that the claim is not

procedurally defaulted because she can show cause and prejudice to excuse it.  A federal habeas

court may not reach the merits of a claim that is procedurally barred unless the petitioner first

shows cause and prejudice.  *See, e.g.*, *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992); *see also*

*Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011).  In support of her argument that requisite case

and prejudice exists, McCarrick again points to the transcript of the pre-trial hearing on her

motion in limine seeking a ruling on whether the trial court would instruct the jury as to

imperfect self defense or imperfect defense of another, which served as the basis for her

argument before the Court of Appeal that it would have been futile to request that the trial court

include delusions in the CALCRIM No. 627.  The Court of Appeal rejected that contention and

found that the parties' and court's discussion on the motion in limine did not serve to excuse

forfeiture from appellate review:

> Before trial, [McCarrick] brought a motion in limine seeking a ruling on whether
> the trial court would instruct the jury that she was guilty only of manslaughter if she had
> acted in imperfect self-defense or imperfect defense of another, that is, that she acted in
> the actual but unreasonable belief that the killings were necessary to prevent imminent
> danger to her daughters.  (CALCRIM No. 571.)  The People opposed the instruction, in
> part on the ground that imperfect self-defense cannot be based on a psychotic delusion
> alone.  (*People v. Mejia–Lenares* (2006) 135 Cal. App. 4th 1437, 1444, 1462, 38 Cal.
> Rptr. 3d 404.)  Defense counsel argued that [McCarrick's] actions were not completely
> delusional because they were based on actual events and things she misinterpreted.  The
> trial court denied the motion, reasoning that there was no authority that the defenses of

19

imperfect self-defense or imperfect defense of another were available when a defendant intentionally killed a victim in order to save the victim from a worse fate.  [McCarrick] does not challenge this ruling.

Later, the parties presented argument to the court as to whether [McCarrick] could introduce evidence about her fears that Paulson was going to harm her or the girls.  The prosecutor initially argued that [McCarrick's] fears were based on paranoia, not hallucination, and hence did not fall within the rule of *Padilla*, *supra*, 103 Cal. App. 4th 675, 126 Cal. Rptr. 2d 889.  In referring to [McCarrick's] belief that Paulson wanted to kill her, the trial court asked defense counsel, "So this is the delusions or—I don't know if we call it a delusion, we call it a hallucination?  This is her—."  Defense counsel argued that [McCarrick's] belief qualified as a hallucination, that is, a perception not based on objective reality for purposes of CALCRIM No. 627.  The prosecutor then argued that, although there was evidence of unreasonable beliefs in late September, [McCarrick] had no conversations on October 11 or 12 that showed delusional beliefs that Paulson would harm her or the girls.  The prosecutor referred to the beliefs as "some hallucination that [McCarrick] was having at the end of September," and argued that "there [was] no evidence that this was going on at the time, on October 12th whatsoever."  Defense counsel countered that there were text messages showing that [McCarrick's] delusions continued to exist on October 12, and argued that *Padilla* supported her position that "these hallucinations are relevant" to the question of premeditation and deliberation.  The prosecutor, in her turn, disputed defense counsel's characterization of the October text messages, pointing out that they referred to the biological father giving up his parental rights and arguing, "That is not hallucinating."

The trial court ruled: "I'm going to allow you to present evidence, what you claim is hallucinations, on this issue . . . .  'I'm going to allow at least a good portion of this evidence, provided it does in fact tend to show [McCarrick] was suffering from hallucinations about this time.  I think there is an inference that can be made if there is evidence that she had these hallucinations within a day or two.  I don't know exactly when, but I think these are factual matters for the jury to determine . . . .  [I]t would be much clearer if the hallucinations had to do with a misunderstanding as to the act that she was committing or she didn't understand who these acts were directed at were her children [sic].  But that's not the nature of these hallucinations, supposedly.  [¶]  As I understand it, these hallucinations had to do with her belief that the children were in imminent peril of being kidnapped and tortured, and therefore this was her alternative as she saw it.  I don't know what evidence there is of that at this point in particular, but you can bring all that out."  When the prosecutor argued that under *Mejia–Lenares*, *supra*, 135 Cal. App. 4th 1437, 38 Cal. Rptr. 3d 404 evidence of unreasonable fear was inadmissible to show imperfect self-defense, the court stated, "I am allowing evidence of hallucination and if part of that—if the argument ultimately is fear induced by these is what caused her to not to be able to form the ability to premeditate, that can be the argument, I suppose.  But the evidence will be as to the actual hallucination."  The court concluded by asking counsel, "Are we all on the same page here?" to which they responded, "Yes."

Despite the prosecutor's initial characterization of [McCarrick's] fears as being based on paranoia, not hallucination, it is clear from this colloquy that at the time the trial court made its ruling, both it and counsel understood that the "hallucinations" in question were [McCarrick's] delusional beliefs. Nothing in these discussions suggests that it would have been futile to ask the trial court to modify the instruction to include delusions because the trial court had already rejected [McCarrick's] interpretation of the law; rather, the court accepted defense counsel's characterization of defendant's delusions as hallucinations for purposes of *Padilla*, *supra*, 103 Cal. App. 4th 675, 126 Cal. Rptr. 2d 889 and CALCRIM No. 627.

*McCarrick*, 210 Cal. Rptr. 3d at 851-53.

McCarrick nonetheless argues that the discussion can support a finding of cause and prejudice sufficient to excuse procedural default here largely by relying on the dissent's contrary conclusion on appeal:

In pretrial argument on a motion in limine concerning the applicability of *Mejia-Lenares*—an argument McCarrick lost when the trial court ruled, correctly, that her irrational fears could not support a claim of imperfect self-defense—her counsel was quite clear that these fears were not "completely delusional as they were in *Mejia–Lenares*." Later, during the guilt phase trial, when the admissibility of McCarrick's fears to negate premeditation and deliberation under the second prong of *Padilla's* holding arose, counsel did, it is true, seem to accept the idea that delusions and hallucinations are interchangeable, but she did so only after the court sounded a note of skepticism about the appropriate terminology, interjecting "I don't know if we call it a delusion," and then immediately asking whether "we call it a hallucination?" Although the People pin blame on the defense for equating delusions and hallucinations, the quote from McCarrick's counsel to which they cite is a response to the court's inquiry during this colloquy, and appears to be nothing more than an effort to fit the evidence within a reading of the law the court seemed inclined to take—and eventually did take.

Who originally came up with the notion that the term "hallucinations," alone, may be used to describe the evidence of McCarrick's paranoid delusions is not definitively clear in the record, but the sequence of events suggests it is more fairly attributable to the People than to the defense. The specific issue under discussion when this point of terminology surfaced was the admissibility of proffered defense testimony from Paulson and "three or four other witnesses who would testify that Ms. McCarrick reached out to them, either spoke to them or sent them test messages that she was afraid of Mr. Paulson and that he was going to hurt—kill her and hurt the girls." The People insisted that this evidence "doesn't rise to the level of a hallucination . . . . Hallucination, as I said in *People versus Padilla* . . . [¶] . . . [¶] . . . it takes it right from the dictionary. It's some kind of belief that you are seeing something, hearing something . . . that's not there. That's not based on reality. And I don't think fear . . . [is] hallucination . . . . [H]er fear

21

is based on paranoia . . . ."[FN10]  While the trial court ultimately ruled for the defense on the evidentiary point then under discussion, deciding to allow testimony about McCarrick's irrational fear of Paulson as it bore on her diminished actuality defense, it did so only within the confines of the People's legal argument—which incorrectly limited the second prong of *Padilla's* holding to hallucination cases.  The court ruled: "I am allowing evidence of hallucination and if part of that—if the argument ultimately is fear induced by these is what caused her to not be able to form the ability to premeditate, that can be the argument, I suppose.  *But the evidence will be as to the actual hallucination.*" (Italics added.)[FN11]

FN10.  The prosecution argued "[t]hat is not a hallucination.  That is paranoia, but there is a difference.  Hallucination is seeing things, hearing things.  I mean, it's right in that *Padilla* case."

FN11.  The court also ruled, "I am going to allow you to bring in evidence of hallucination on the issue of ability to deliberate and premeditate, but that is as far as it goes."  It noted "there is no question that hallucination, evidence of hallucinations can have a bearing and is relevant on the issues of premeditation and deliberation, and that is supported by . . . this *Padilla* case."  And again, it said, "I'm going to allow at least a good portion of this evidence, provided it does in fact show [McCarrick] was suffering from hallucinations about this time."

It may be that later, at the close of the guilt phase evidence, when the instructions were argued and settled, it would have been wise for McCarrick's counsel to propose a pinpoint modification to CALCRIM No. 627, making clear that it covers the type of delusions shown by the evidence in this case.  But her failure to make such a request should not come at the price of forfeiture.  Her substantial rights were affected by the instruction (PEN. CODE, § 1259; *see People v. Gray* (2005) 37 Cal.4th 168, 235, 33 Cal. Rptr. 3d 451, 118 P.3d 496), and in any event, any effort to seek a modification would likely have been futile.  (*People v. Boyette* (2002) 29 Cal.4th 381, 432, 127 Cal. Rptr. 2d 544, 58 P.3d 391; *see People v. O'Connell* (1995) 39 Cal. App. 4th 1182, 1190, 46 Cal. Rptr. 2d 379 [applying "the principle of law that excuses parties for their failure to raise an issue at trial where to do so would have been an exercise in futility" where defendant failed to request clarifying modification of challenged pattern instruction after trial court had unequivocally rejected legal argument supporting the clarification].)  By the time the guilt phase instructions were argued and settled, the trial court had already ruled, unequivocally, and unduly narrowly, in my view, that *Padilla* applies only to hallucinations.  Since the court had already announced its interpretation of *Padilla*, McCarrick was not required to seek reconsideration.  At that stage, given what the evidence showed—paranoid delusions based on a misperception of actual facts—the court had a sua sponte duty to correct its own error and add clarifying language to make sure the jury understood CALCRIM No. 627 applies to any form of delusionary thinking, including hallucinations.

*McCarrick*, 210 Cal. Rptr. 3d at 864-65 (Streeter, J., dissenting).

Upon independent review, the Court finds that the reasoning employed by the Court of Appeal in finding McCarrick's claim forfeited, as quoted above, also fully supports that McCarrick fails to establish the requisite cause and prejudice to excuse the procedural default. Moreover, the Court of Appeal also denied the claim on the merits as follows:

> [McCarrick] points out that the prosecutor argued in her closing argument that there was no evidence she was suffering from hallucinations the day of the killings. According to [McCarrick], this argument suggested to the jury that her delusions did not qualify as hallucinations for purposes of CALCRIM No. 627. The record does not support this conclusion. The prosecutor made this statement while summing up her argument that, although [McCarrick] had expressed irrational fears of her fiancé a week or two previously, there was no evidence she was experiencing such fears on the day of the killings. Defense counsel then argued that the hallucination instruction was important because [McCarrick] had irrational beliefs that Paulson intended to kill her and harm the girls and that he had a vendetta against her. In her rebuttal, the prosecutor did not challenge defense counsel's characterization of the delusions as hallucinations, but argued again that [McCarrick] did not appear irrational on the day of the killings. There is no reasonable possibility that the jury interpreted the instruction to preclude it from considering [McCarrick's] delusions.[FN8]

> > FN8.  We are unpersuaded by [McCarrick's] argument that our Supreme Court's decision in *People v. Elmore* (2014) 59 Cal.4th 121, 136, footnote 7, 172 Cal. Rptr. 3d 413, 325 P.3d 951 indicates that the term "delusion" includes hallucinations, but not vice versa, and that the terms are therefore not interchangeable for purposes of CALCRIM No. 627. On this record, there is no basis to conclude the jury did not understand the instruction to include [McCarrick's] claimed delusions that she and the girls were at risk of harm.

*McCarrick*, 210 Cal. Rptr. 3d at 853.

McCarrick argues in her Traverse that the Court of Appeal unreasonably applied and contravened Federal law in its merits determination. But she cites no Supreme Court authority to support the theory that the term delusion is distinct from hallucination. She therefore appears to rely on the general Supreme Court authority addressed in the standards enumerated above to

argue that the court's failure to specifically refer to delusions when instructing pursuant to CALCRIM No. 627 "did, in fact, preclude the jury from considering the defense evidence of Ms.. McCarrick's false beliefs on the issues of premeditation and deliberation and thus removed her only real defense at the guilt phase from jury consideration" and therefore had a "substantial and injurious effect on the verdict."  Docket No. 41 at 13.

But as aforementioned, "evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Because McCarrick cites no Supreme Court authority to support the theory that the term delusion is distinct from hallucination, and this Court is unaware of any, the Court cannot find unreasonable or contrary to Federal law the Court of Appeal's determination that there was no reasonable probability that the jury could have understood the instruction as given to preclude them from considering McCarrick's claimed delusions that she and the girls were at risk of harm when assessing whether McCarrick acted with premeditation and deliberation.  McCarrick is therefore not entitled to relief on this claim.

B.    *CALCRIM 3450*

McCarrick additionally contends that the trial court erred in instructing the jury as to her insanity defense.  The record reflects that the trial court instructed the jury with CALCRIM No. 3450 as follows:

> You have found the defendant guilty of murder and inflicting injury on a child under eight causing death.  Now you must decide whether she was legally sane at the time she committed the crime.  [¶]  The defendant must prove that it is more likely than not that she was legally insane when she committed the crimes.  [¶]  The defendant is legally insane if: [¶] First, when she committed the crimes, she had a mental disease or defect. [¶] And secondly, because of that disease or defect she was incapable of

24

understanding the nature and quality of her acts, or was incapable of knowing or understanding that her acts were morally or legally wrong.  [¶]  None of the following qualifies as a mental disease or defect for purposes of an insanity defense: Personality disorder, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts.  [¶]  If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, and that settled mental disease or defect combined with another mental disease or defect, that may qualify as legal insanity.  A settled disease or defect is one that remains after the effects of the drugs or intoxicants has worn off.  [¶]  You may consider any evidence that the defendant had a mental disease or defect before the commission of the crimes.  If you are satisfied that she had a mental disease or defect before she committed the crimes, you may conclude that she suffered from the same condition when she committed the crimes.  You must decide whether that mental disease or defect constitutes legal insanity.

*McCarrick*, 210 Cal. Rptr. 3d at 856-57.

McCarrick argues, as she did on direct appeal, that the instruction was erroneous for three reasons.  First, McCarrick points to the portion of the insanity test referring to her understanding that the acts were "morally or legally wrong," and argues that the jury could have understood that phrase to mean "morally and legally wrong."  Second, she argues that the instruction did not make clear that her incapacity to understand right from wrong did not refer to a general incapacity so to understand, but to her capacity "in respect of the 'very act' charged."  Third, she contends the paragraph listing the conditions that would not support a finding of insanity—including adjustment disorder—should have been omitted because it could confuse and mislead the jury.

The Court of Appeal rejected as forfeited for failure to raise before the trial court her first contention regarding the phrase "morally or legally wrong."  As discussed *supra* with regard to Claim 1, the appellate court's reliance on the contemporaneous objection rule in rejecting this instructional error claim likewise forecloses federal habeas review.  *See, e.g.*, *Inthavong*, 420 F.3d at 1058.  Moreover, the Court of Appeal reasonably concluded that the claim is "entirely

unpersuasive" as McCarrick offered no basis other than speculation to believe that the jury

would have interpreted the phrase "legally or morally wrong" to mean "legally *and* morally

wrong." *McCarrick*, 210 Cal. Rptr. 3d at 857.  Nor does McCarrick provide such support on

federal habeas review.  *Woodford v. Visciotti*, 537 U.S. 19, 15 (2002) (*per curiam*) (holding that

state habeas petitioner carries the burden of proof).

    The Court of Appeal likewise concluded that McCarrick's second contention–that the

instruction failed to inform the jury that she had to be incapable of understanding the

wrongfulness of the "very act" charged–was forfeited on direct appeal, thus rendering the claim

procedurally barred on federal habeas review as well.  *See, e.g.*, *Inthavong*, 420 F.3d at 1058.  In

any event, as the Court of Appeal reasonably concluded, "[t]he only reasonable interpretation of

this language is that it refers to the offenses with which [McCarrick] was charged."  *McCarrick*,

210 Cal. Rptr. 3d at 858.

    In her counseled Traverse, McCarrick focuses on the third reason enumerated above and

argues that the Court of Appeal unreasonably applied Federal law when it held that the inclusion

of "adjustment disorder" in CALCRIM No. 3450 was not reasonably likely to confuse or mislead

the jury.  The Court of Appeal considered and rejected on direct appeal McCarrick's contention

regarding "adjustment disorder" as follows:

> We likewise reject [McCarrick's] contention that the instruction contained surplus
> language that confused and misled the jury, specifically, the paragraph stating that
> various conditions, including adjustment disorder, were insufficient to establish
> insanity.[FN9]

>> FN9.   [McCarrick] objected to this portion of the instruction at the beginning of
>> the sanity phase of the trial.  Although she did not renew her objection
>> after evidence had been presented, we will not treat the issue as forfeited.

[McCarrick] points out that the only indication she had an adjustment disorder was found in jail records discussed by the mental health experts, which were not admitted for their truth; rather, the jury was instructed, "Doctors John Shields, Pablo Stewart and Janice Nakagawa testified that in reaching their conclusions as expert witnesses they considered statements made by mental health providers, jail staff, police officers, friends and relatives of [McCarrick], and [McCarrick] herself, including texts and e-mails.  You may consider these statements only to evaluate the expert's opinion.  *Do not consider these statements as proof that the information contained in the statements is true*."  (Italics added.)  In closing argument, the prosecutor pointed out that while cross-examining the experts, she had confronted them about the fact that the jail records showed [McCarrick] was being treated for adjustment disorder.

Because the evidence of adjustment disorder was not admitted for its truth, [McCarrick] argues, the instruction referring to it was not responsive to the evidence and was likely to confuse the jury.  We disagree.  The jury was instructed that in evaluating the expert's opinions, it could consider the material upon which the experts relied, and that material included the diagnosis of adjustment disorder.  Nor do we see any possibility of confusion.  [McCarrick's] theory of the case was that she suffered from a mental disease with psychotic, delusional features; the prosecution's theory was that there was no evidence [McCarrick] was suffering delusions on the day of the killings and that, if she was, they were a result of her drug use.  There is no basis to conclude that the listing of conditions insufficient to support a finding of insanity misled the jury in any way.

*McCarrick*, 210 Cal. Rptr. 3d at 858.

In arguing that the Court of Appeal's conclusion unreasonably applied Federal law, McCarrick again points to no specific authority of the U.S. Supreme Court when arguing that "it is reasonably likely the jury accepted that there was a substantial basis for finding Ms. McCarrick was suffering from an adjustment disorder at the time of the homicides and found she was sane based on the surplus language permitting such finding."  Docket No. 41 at 15.  And again, "evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Yarborough*, 541 U.S. at 664.  Given this leeway and the deference this Court must afford the state court decision, the Court cannot find unreasonable or contrary to Federal law the Court of Appeal's determination that there was no reasonable

27

probability that the challenged instruction would have misled the jury in the manner she now

suggests.  Accordingly, McCarrick is not entitled to relief on this claim either.

Ground 2.	*Sufficiency of the Evidence*

McCarrick additionally avers that there was insufficient evidence to support the jury's

finding that she was sane when she killed her children.  As articulated by the Supreme Court in

*Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443

U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-

33 (2010) (reaffirming this standard).  This Court must therefore determine whether the

California court unreasonably applied *Jackson*.  In making this determination, this Court may not

usurp the role of the finder of fact by considering how it would have resolved any conflicts in the

evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.

Rather, when "faced with a record of historical facts that supports conflicting inferences," this

Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact

resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority

for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Consequently, although the sufficiency of the evidence review by this Court is grounded in the

Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set

forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  This Court must also be ever mindful of the

deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency

review.  *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).  A fundamental principle of our

federal system is "that a state court's interpretation of state law, including one announced on

direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam); *see West v. AT&T*, 311 U.S. 223, 236

(1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has

spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

The Court of Appeal considered and rejected McCarrick's legal insufficiency claim on

direct appeal as follows:

> As [McCarrick] points out, each of the experts who testified concluded
> [McCarrick] was not able to understand that her actions were legally or morally wrong.
> However, "expert testimony, even if uncontradicted, is not binding on the trier of fact,
> and may be rejected, *especially where experts are asked to speculate about a defendant's
> state of mind at the moment the crime was committed* . . . .  The trier of fact may consider
> the reasons given for expert opinions, and may weigh expert testimony with all of the
> evidence including the circumstances before, during, and after the offenses." (*People v.
> Green* (1984) 163 Cal.App.3d 239, 243-244, 209 Cal. Rptr. 255, italics added.)  As our
> Supreme Court has stated, "'However impressive [a] seeming unanimity of expert
> opinion may at first appear . . . our inquiry on this just as on other factual issues is
> necessarily limited at the appellate level to a determination whether there is substantial
> evidence in the record to support the jury's verdict of sanity . . . under the law of this
> state. [Citations.]  It is only in the rare case when "the evidence is uncontradicted and
> entirely to the effect that the accused is insane" [citation] that a unanimity of expert
> testimony could authorize upsetting a jury finding to the contrary.' [Citation.]  Indeed we
> have frequently upheld on appeal verdicts which find a defendant to be sane in the face of
> contrary unanimous expert opinion. [Citations.]" (*People v. Drew* (1978) 22 Cal.3d 333,
> 350, 149 Cal.Rptr. 275, 583 P.2d 1318, superseded by statute on other grounds as stated
> in *Skinner*, *supra*, 39 Cal.3d at pp. 768-769, 217 Cal. Rptr. 685, 704 P.2d 752.)  The chief
> value of an expert's testimony "'rests upon the material from which his opinion is
> fashioned and the reasoning by which he progresses from his material to his
> conclusion.'" (*Drew*, at p. 350, 149 Cal. Rptr. 275, 583 P.2d 1318.)
>
> One more prefatory note: A defendant may not be found insane solely on the
> basis of addiction to, or abuse of, intoxicating substances. (§ 29.8.)  This provision
> "makes no exception for brain damage or mental disorders caused solely by one's
> voluntary substance abuse but which persists after the immediate effects of the intoxicant
> have dissipated.  Rather, it erects an absolute bar prohibiting use of one's voluntary
> ingestion of intoxicants as the sole basis for an insanity defense, regardless whether the

substances caused organic [brain] damage or a settled mental disorder which persists after the immediate effects of the intoxicant have worn off."  (*People v. Robinson* (1999) 72 Cal. App. 4th 421, 427, 84 Cal. Rptr. 2d 832.)  Pursuant to this rule, the jury was instructed that "[i]f the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, and that settled mental disease or defect combined with another mental disease or defect, that may qualify as legal insanity.  A settled disease or defect is one that remains after the effects of the drugs or intoxicants has worn off." (CALJIC No. 3450.)

On this record, we conclude that the jury could have found that [McCarrick] did not meet her burden to show she was insane at the time of the crimes.  Because the defendant has the burden of proof on the issue of insanity, "the question on appeal is not so much the substantiality of the evidence favoring the jury's finding as whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it."  (*People v. Drew*, *supra*, 22 Cal.3d at p. 351, 149 Cal. Rptr. 275, 583 P.2d 1318; *accord People v. Duckett* (1984) 162 Cal. App. 3d 1115, 1119, 209 Cal. Rptr. 96 (*Duckett*).)  [McCarrick] had a long history of drug use, particularly abuse of methamphetamine.  She had used methamphetamine on a nearly daily basis from ages 18 to 25 and had been using it in the weeks preceding the killings, up to at least four days beforehand, during the time she expressed fears of Paulson and others. Dr. Shields acknowledged that paranoia is a common side effect of ongoing methamphetamine use, that long-term drug use can cause delusions, and that long-term drug use can cause mental problems well after someone uses the drug.  There was also evidence from which a jury could conclude that the expert opinions did not take sufficiently into account the overlap between the times [McCarrick] was using drugs and the times she suffered delusions.  [McCarrick] expressed fear of Paulson and others in late September 2010, at a time there is evidence she was using methamphetamine.  She thought someone had poisoned her pizza on the day she admitted to last smoking methamphetamine.  In 2012, [McCarrick] used cocaine and was treated for a possible overdose; she was paranoid and delusional and stated gangs were out to kill her for "snitch[ing]" on a boyfriend 10 years previously.  Dr. Stewart testified that [McCarrick's] substance abuse history played a role in the crimes, although he did not believe it was the primary cause of her altered mental state.  Dr. Nakagawa testified that [McCarrick's] drug use could have contributed to the onset of psychosis, although she believed [McCarrick] had a disorder with psychotic features independent of the drug use.  She also acknowledged that [McCarrick's] delusions a few days before the killings, after which she drove the girls home from Roxanne's house in the middle of the night, were induced by methamphetamine.  Even in the face of the unanimous expert opinions, the jury could rationally reject those opinions and find that [McCarrick's] long-term and recent drug use, singly or in combination, caused any psychotic symptoms she was experiencing at the time of the killings and that [McCarrick] had not met her burden to show she was legally insane.

The record also contains evidence from which the jury could conclude that [McCarrick] knew the nature and quality of her acts and that her actions were both legally and morally wrong.  She told Dr. Nakagawa she began planning to kill the girls about two days before she did so.  Her own explanation of events indicates that she

intended to kill them.  She told a cousin on the day of the killings, "You are going to hate me."  On the telephone after the killings, she told Paulson to tell the girls "it was an accident" if they survived.  There was also evidence that [McCarrick] was overwhelmed by the demands of caring for the girls and wanted to be young and free and to "party." This evidence could support a finding that [McCarrick] not only knew the nature of her acts but also knew they were both legally and morally wrong when she committed them.

We are not persuaded otherwise by [McCarrick's] reliance on *Duckett*, *supra*, 162 Cal. App. 3d 1115, 209 Cal. Rptr. 96.  In *Duckett*, a divided court concluded the jury could not reasonably reject the three experts' unanimous opinions of defendant's insanity where there was evidence that defendant reported he saw demons; that he was obsessed with the victim and believed she was a witch who was practicing voodoo on him; that he had a long history of chronic paranoid schizophrenia characterized by disordered thoughts, delusions, hallucinations, inappropriate affect, and bizarre behavior; that while in the hospital, he developed a "delusional system" within two weeks of being taken off medications on an experimental basis; and that before the offense, he had ceased taking his medications.  (*Id.* at pp. 1120-1123, 209 Cal. Rptr. 96.)  Additionally, the defendant had previously shot other victims; for these crimes, he had been found legally insane, and was confined to a mental hospital for five years.  Within a month of his release, he shot and killed the victims in his current case.  (*Id.* at p. 1118, 209 Cal.Rptr. 96.)  Here, the evidence of persistent insanity and delusions was far less compelling.  Moreover, the evidence here was susceptible to an interpretation that [McCarrick's] delusions stemmed from her drug use, which also distinguishes this case from *Duckett*.

*People v. Samuel* (1981) 29 Cal. 3d 489, 174 Cal.Rptr. 684, 629 P.2d 485 is similarly distinguishable.  There, the evidence of incompetence was overwhelming: as our high court has recently explained, "'Five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified to Samuel's incompetency, and four psychiatric reports were admitted into evidence. [Citation.]  Each witness and every report concluded Samuel was incompetent to stand trial.  [Citation.]  In response, the prosecution offered no expert testimony and only two lay witnesses, neither of whom contradicted any of the defense testimony.  [Citation.] . . . Prosecution witnesses merely testified regarding Samuel's escape from Patton State Hospital and his ability to perform routine manual tasks.'  [Citation.]  On that record, we found that no reasonable trier of fact could reject the defense evidence of incompetency.  [Citations.]'"  (*People v. Mendoza* (2016) 62 Cal. 4th 856, 882, 198 Cal. Rptr. 3d 445, 365 P.3d 297, *citing Samuel*, at p. 506, 174 Cal. Rptr. 684, 629 P.2d 485.)  The question before the experts here was not [McCarrick's] current competence to stand trial, but her mental state at the time of the crimes, and for the reasons we have discussed, the jury could reasonably reject their opinions.

*McCarrick*, 210 Cal. Rptr. 3d at 854-56.

Here, McCarrick essentially asks this Court to credit the opinion of the defense experts over any other evidence presented at trial.  But this Court is limited to determining whether the

state court unreasonably applied federal law, under which it must "presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *See Jackson*, 443 U.S. at 326.  As the state court noted, the jury was not limited to merely weighing the opinions of these four experts but was expected to assess all of the evidence before it.  *See People v. Drew*, 583 P.2d 1318, 1327-28 (Cal. 1978) (noting that the California Supreme Court has "frequently upheld on appeal verdicts which find a defendant to be sane in the face of contrary unanimous expert opinion"), *superseded by statute on other grounds as recognized in People v. Skinner*, 704 P.2d 752 (Cal. 1985).  Considering the "sharply limited nature of constitutional sufficiency review" and applying the "additional layer of deference" required by AEDPA, this Court finds that the California court's rejection of McCarrick's sufficiency claim related to her sanity was not objectively unreasonable, for the reasons persuasively explained by the Court of Appeal.  *Juan H.*, 408 F.3d at 1274-75; *see also Jackson*, 443 U.S. at 319, 326. Accordingly, McCarrick is not entitled to habeas relief on this claim.

V. CONCLUSION AND ORDER

McCarrick is not entitled to relief on any ground raised in her Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court grants a Certificate of Appealability solely with respect to McCarrick's claims that: the trial court committed instructional error by precluding the jury from considering McCarrick's paranoid delusions in resolving whether she had acted with premeditation and deliberation (Ground 1); and there was no substantial evidence to support the jury's sanity verdict because the jury "could not reasonably reject" the opinions of

three defense experts that McCarrick had been legally insane (Ground 2).  *See* 28 U.S.C.

§ 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a

prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's

resolution of his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).

Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit

Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 19, 2020.

          /s/James K. Singleton, Jr.
          JAMES K. SINGLETON, JR.
          Senior United States District Judge